_____

|  |  |
|---|---|
| FARRIER PRODUCT DISTRIBUTION, INC., | : |
| | : |
| Plaintiff, | : |
| | : |
| | : |
| v. | : |
| THE UNITED STATES; | : |
| DONALD J. TRUMP, in his official capacity as | : |
| PRESIDENT OF THE UNITED STATES; | : |
| UNITED STATES CUSTOMS AND BORDER | : |
| PROTECTION; | : |
| MARK A. MORGAN in his official capacity as | : |
| ACTING COMMISSIONER OF U.S. CUSTOMS | : |
| AND BORDER PROTECTION; | : |
| UNITED STATES DEPARTMENT OF | : |
| COMMERCE; and | : |
| WILBUR J. ROSS, Jr., in his official capacity as | : |
| SECRETARY OF COMMERCE, | : |
| | : |
| Defendants. | : |

Court No. 20-00098

_____

## COMPLAINT

Farrier Product Distribution, Inc. ("FPD"), by and through its attorneys, Barnes,

Richardson & Colburn, LLP, brings this civil action, alleging the following:

### SUMMARY

1.      On January 24, 2020, President Donald J. Trump issued Proclamation 9980

imposing a 25 percent tariff on imports of so-called "derivative" steel products,[1] purportedly

pursuant to his power under Section 232 of the trade Expansion Act of 1962, as amended (19

_____

[1] Proclamation 9980 also imposed duties on derivative aluminum products. FPD is not an importer of any derivative aluminum products and therefore is not able to contest the imposition of those duties in this litigation.

U.S.C. §1862) ("Section 232"), to protect the national security of the United States. See 85 Fed. Reg. 5281 (Jan. 29, 2020) ("Proclamation 9980) (attached as Exhibit 1).

2.      FPD is an importer of steel products included within the definition of derivative steel products under Proclamation 9980 and subject to the 25% tariffs imposed by Proclamation 9980. Because its U.S. sales of those products are a significant percentage of the company's overall revenue, it will be adversely affected by these tariffs. FPD did not have an opportunity to provide input into the President's decision to impose these tariffs because the Secretary of Commerce did not undertake the required investigation or publish any report of his findings. There was no public announcement about these tariffs until January 24, 2020—the day Proclamation 9980 was issued.

3.      Section 232 expressly limits the President's authority to impose tariffs. Before the President may do so, the Secretary of Commerce must first investigate whether imports of the products at issue actually threaten to impair the national security. Within 270 days of beginning that investigation, the Secretary must submit to the President, and publish in the Federal Register, a report of his findings. 19 U.S.C. §1862(b)(3). Within 90 days of receiving a report that such imports do pose a threat, the President must decide whether he agrees and, if so, the nature and duration of any remedial action. Id. §1862(c)(1)(A)(ii). Finally, within 15 days of making that decision, that action must be implemented. Id. §1862(c)(1)(B).

4.      None of these statutory requirements were met when Proclamation 9980 was issued. The Secretary of Commerce never conducted a Section 232 investigation to determine whether the derivative steel products at issue threatened national security. The Secretary did not submit a written report to the President, nor publish one in the Federal Register, relating to those

imports. Because there was no report, the statute's deadlines for Presidential decision and implementation were also not met.

5.      Almost three years ago, in 2017, the Secretary investigated the effects of imports of certain steel mill imports. On January 11, 2018 he submitted a report regarding the effect of such imports on the national security to the President. U.S. Department of Commerce, Bureau of Industry and Security, Office of Technology Evaluation, <u>The Effect of Imports of Steel on the National Security: An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as Amended</u> (Jan. 11, 2018) ("<u>Steel Report</u>") (attached as Exhibit 2).

6.      That investigation (and the tariffs subsequently imposed by the President pursuant to that investigation) did not cover any of the derivative articles of steel covered by Proclamation 9980. Even if they had, Proclamation 9980 would violate the deadlines imposed by Section 232. Proclamation 9980 was issued 744 days after the President received the <u>Steel Report</u> and 640 days after he was required to implement any action based on the <u>Steel Report</u>.

7.      Proclamation 9980 is unlawful because it was issued contrary to the requirements of Section 232. In issuing it, the President exceeded the powers delegated to him by Congress under Section 232. The Proclamation is also unlawful because it denies FPD which is similarly situated to importers of derivative products of steel not listed in the Proclamation, equal protection of the laws as guaranteed by the Fifth Amendment's Due Process clause.

**JURISDICTION**

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§1581(i)(2) and (4). Section 1581 provides that "the U.S. Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for… tariffs, duties, fees, or other taxes

on the importation of merchandise for reasons other than the raising of revenue," 28 U.S.C. §1581(i)(2), and "administration and enforcement with respect to the matters referred to in paragraphs (1)-(3) of this subsection {(i)}." Id. §1581(i)(4).

## PARTIES

9.      Plaintiff FPD is based in Shelbyville, Kentucky and is one of the premier distributors of horseshoes, horseshoe nails, tools, and other hoof products for professional farriers. FPD is part of preserving a horse tradition that stretches back to the earliest days of European settlement in America. FPD directly employs 19 people in the United States at one location and indirectly supports roughly 150 retailers across the United States. FPD directly imports significant quantities of steel horseshoe nails included within the definition of derivative steel products under Proclamation 9980, which imposes 25% duties on imported derivative steel products under Section 232 of the Trade Expansion Act of 1962. As importer of record FPD would be subject to the 25% tariff under Proclamation 9980.

10.     Defendant United States will be the recipient of the Section 232 tariffs that are the subject of this suit and is the statutory defendant under sections 1581(i)(2) and (4).

11.     Defendant Donald J. Trump is the President of the United States. He issued Proclamation 9980 that is the subject of this Complaint. He is sued in his official capacity only.

12.     Defendant United States Customs and Border Protection ("CBP") is the agency that administers and enforces the tariffs imposed under Section 232, including the tariffs ordered pursuant to Proclamation 9980.

13.     Defendant Mark A. Morgan is the Acting Commissioner of CBP. He is sued in his official capacity only.

14.    Defendant United States Department of Commerce ("Commerce") is the agency responsible by statute for initiating and conducting an investigation under Section 232 and for providing findings and recommendations to the President of the United States. Proclamation 9980 purports to take action in response to certain undisclosed "assessments" and "recommendations" of Commerce.

15.    Defendant Wilbur L. Ross, Jr., is the Secretary of the United States Department of Commerce. He is sued in his official capacity only.

## STANDING

16.    FPD has standing to bring this action pursuant to 28 U.S.C. §2631(i), which states that "{a}ny civil action of which the Court of International Trade has jurisdiction, other than an action specified in subsections (a)-(h), may be commenced in the court by any person adversely affected or aggrieved by agency action within the meaning of section 702 of title 5," which in turn states that "{a} person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. §702.

17.    FPD has standing to challenge the Defendants' unlawful acts in issuing and implementing Proclamation 9980 imposing tariffs of 25% on certain derivative articles of steel. FPD is a nationwide distributor of hoof products including, among other products, steel horseshoe nails, which directly imports articles subject to the 25% tariff on derivative articles of steel imposed by the challenged Proclamation. FPD is the importer of record in the United States and is responsible under the Proclamation for paying the 25% tariff. Therefore, FPD is a "person … adversely affected or aggrieved" by the issuance and implementation of Proclamation 9980,

within the meaning of 5 U.S.C. §702, and will suffer concrete and particularized injury as a result of the issuance and implementation of Proclamation 9980.

**FACTS**

**I.    SECTION 232 OF THE TRADE EXPANSION ACT OF 1962**

18.    Section 232, titled "Safeguarding National Security," authorizes the President, upon a "finding" that "an article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security," to take action "to adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security." 19 U.S.C. §1862(c)(1)(A)(ii). Section 232 dictates the administrative process required before the President can make such an action. Id. § 1862(b).

19.    A Section 232 action begins with a request from "the head of any department or agency," including the Secretary of Commerce himself, to the Secretary of Commerce, who "shall immediately initiate an appropriate investigation to determine the effects on the national security of imports of the article which is the subject of such request." Id. §1862(b)(1)(A). Commerce's Bureau of Industry and Security ("BIS") conducts Section 232 investigations in accordance with the federal regulations codified at 15 C.F.R. part 705.

20.    Section 232 requires that the Secretary of Commerce conduct the investigation in consultation with the Secretary of the Department of Defense ("Secretary of Defense") and other U.S. officials, as appropriate, to determine the effects of the specified imports on the national security. Specifically, the Secretary of Commerce shall "immediately provide notice to the Secretary of Defense of any investigation," shall "consult with the Secretary of Defense regarding the methodological and policy questions raised in any investigation," and if appropriate, shall "hold public hearings or otherwise afford interested parties an opportunity to

present information and advice." 19 U.S.C. §§1862(b)(1)(B), (b)(2)(A). The "Secretary of Defense shall provide the Secretary {of Commerce} an assessment of the defense requirements of any article" under investigation. Id. §1862(b)(2)(B).

21.     Within 270 days after initiating as investigation, the Secretary of Commerce "shall submit to the President" and publish in the Federal Register "a report on the findings of such investigation with respect to the effect of the importation of such article in such quantities or under such circumstances upon the national security and, based on such findings, the recommendations of the Secretary for action or inaction under th{e} section." Id. §1862(b)(3)(A). "If the Secretary finds that such article is being imported into the Unites States in such quantities or under such circumstances as to threaten to impair the national security, the Secretary shall so advise the President in such report." Id.

22.     "Any portion of the report submitted by the Secretary {of Commerce} under {§1862(b)(3)} (A) which does not contain classified information or proprietary information shall be published in the Federal Register." Id. §1862(b)(3)(B).

23.     A report by the Secretary of Commerce that finds that an article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security triggers a duty of the President to act. Within 90 days, the President must "determine whether the President concurs with the finding of the Secretary." Id. §1862(c)(1)(A). Conversely, if the Secretary of Commerce's report does not contain a finding that an article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security, the President has neither a duty nor the authority to take any action under Section 232. See id.

24.     If the President concurs with the Secretary of Commerce that an article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security, the President must "determine the nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security." Id. §1862(c)(1)(A)(ii). After making this determination, the President has 15 days to implement the action. Id. §1862(c)(1)(B).

25.     Finally, the President must "submit to the Congress a written statement of the reasons" explaining his determination "{b}y no later than the date that is 30 days after the date on which the President makes any determinations." Id. §1862(c)(2).

## II.     COMMERCE'S INVESTIGATION OF STEEL ARTICLES UNDER SECTION 232

26.     On April 19, 2017, Secretary of Commerce Wilbur Ross initiated an investigation under Section 232 into the effects of certain steel imports on the national security of the United States. As part of the investigation, Commerce collected written public comments, held a public hearing, and consulted with the Secretary of Defense, Notice Request for Public Comments and Public Hearing on Section 232 National Security Investigation of Imports of Steel, 82 Fed. Reg. 19.205 (April 26, 2017).

27.     On January 11, 2018, BIS issued the Steel Report. The Steel Report expressly stated that the scope of the investigation was limited to certain steel mill products ("steel articles") described and classified in the Harmonized Tariff System under subheadings 720610 through 721650, 721699 through 730210, 730240 through 730290, and 730410 through 730690. See Steel Report at 21 ("Product Scope of the Investigation"). None of these products encompassed derivative steel products such as Plaintiff's steel horseshoe nails.

28.     The <u>Steel Report</u> observed that the United States' domestic steel industry was in decline, that shrinking "capacity utilization rates" were deterring capital investment and that foreign imports had contributed to the falloffs in domestic production. <u>Steel Report</u> at 3-5. "{T}he Secretary of Commerce conclude{d} that the present quantities and circumstance of steel imports are responsible for a 'weakening of our internal economy' and threaten to impair the national security as defined in Section 232." <u>Id</u>. at 5. Commerce identified global excess steel capacity as a circumstance that contributes to the "weakening of our internal economy" that "threaten{s} to impair" the national security as defined in Section 232. <u>Id</u>. at 5, 16. It explained that "U.S. steel production capacity has remained flat since 2001, while other steel producing nations have increased their production capacity, with China alone able to produce as much steel as the rest of the world combined." <u>Id</u>. at 52. Commerce recommended that the President take immediate action to adjust the level of these imports through quotas or tariffs. <u>Id</u>. at 58-61. Commerce recommended three alternative actions, each of which had the stated objective of enabling the U.S steel industry to operate at an average capacity utilization rate of 80 percent or better. <u>Id</u>. at 6-9.

29.     In the <u>Steel Report</u>, Commerce explained that it analyzed the impact of the subject steel imports using a broad definition of "national security," to include not only the term "national defense" but also to "include{ } the general security and welfare of certain industries, beyond those necessary to satisfy national defense requirements, which are critical to minimum operations of the economy and government." <u>Steel Report</u> at 1, 13-15 (quotation omitted).

30.     On February 18, 2018, the Secretary of Defense sent a letter to Commerce providing its position on the recommendations contained in the <u>Steel Report</u>. The Secretary of Defense conveyed that in his view, "U.S. military requirements for steel and aluminum each only

represent about three percent of U.S. production" and "{t}herefore, DoD does not believe that the findings in the reports {by Commerce} impact the ability of DoD programs to acquire the steel or aluminum necessary to meet national defense requirements." Memorandum from Sec'y of Def. to Sec'y of Commerce re: Response to Steel and Aluminum Policy Recommendations (Feb. 18, 2018) ("Defense Memorandum") at 1 (attached as Exhibit 3). The Secretary of Defense also shared that the Department of Defense "continues to be concerned about the negative impact on our key allies" of "the recommended options within the reports." Id.

31.     Horseshoe nails are not currently produced in the United States, and there is no indication in either the Steel Report or the Defense Memorandum that horseshoe nails are an important element of the Department of Defense's national defense requirements.

III.     THE PROCLAMATION OF ARTICLES OF STEEL

32.     Based on the Steel Report, on March 8, 2018, President Donald J. Trump issued Proclamation 9705 pursuant to Section 232.

33.     Proclamation 9705 was entitled "Adjusting Imports of Steel into the United States" and imposed 25% tariffs on U.S. imports of certain steel products. See 83 Fed. Reg. 11625 (Mar. 15, 2018) ("Proclamation 9705") (attached as Exhibit 4).

34.     Proclamation 9705 stated "that Canada and Mexico present a special case" given their "shared commitment {with the United States} to support . . . each other in addressing national security concerns." Id. at 11626. Accordingly, the President "determined that the necessary and appropriate means to address the threat to national security posed by imports of steel articles from Canada and Mexico is to continue ongoing discussions with these countries" and exempt them "from the tariff, at least at this time." Id.

35.    The new 25% steel tariffs were scheduled to take effect as to all countries other than Canada and Mexico on March 23, 2018.

36.    Proclamation 9705 imposed tariffs on the following articles:

- flat-rolled products provided for in headings 7208, 7209, 7210, 7211, 7212, 7225 or 7226;

- bars and rods provided for in headings 7213, 7214, 7215, 7227, or 7228; angles, shapes and sections of {heading} 7216 (except subheadings 7216.61.00, 7216.69.00 or 7216.91.00); wire provided for in headings 7217 or 7229; sheet piling provided for in subheading 7301.10.00; rails provided for in subheading 7302.10; fish-plates and sole plates provided for in subheading 7302.40.00; and other products of iron or steel provided for in subheading 7302.90.00;

- tubes, pipes and hollow profiles provided for in heading 7304, or 7306; tubes and pipes provided for in heading 7305;

- ingots, other primary forms and semi-finished products provided for in heading 7206, 7207 or 7224; and

- products of stainless steel provided for in heading 7218, 7219, 7220, 7221, 7222 or 7223.

Id. at 11629.

37.    Proclamation 9705 made no reference to derivative articles of steel, or to the specific derivative articles of steel included in Proclamation 9980, including the steel horseshoe nails imported by Plaintiff.

38.    Proclamation 9705 instructed that:

The Secretary shall continue to monitor imports of steel articles and shall, from time to time, in consultation with the Secretary of State, the Secretary of the Treasury, the Secretary of Defense, the USTR, the Assistant to the President for National Security Affairs, the Assistant to the President for Economic Policy, the Director of the Office of Management and Budget, and such other senior Executive Branch officials as the Secretary deems appropriate, review the status of such imports with respect to the

national security. The Secretary shall inform the President of any circumstances that in the Secretary's opinion might indicate the need for further action by the President under Section 232 of the Trade Expansion Act of 1962, as amended. The Secretary shall also inform the President of any circumstance that in the Secretary's opinion might indicate that the increase in duty rate provided for in this proclamation is no longer necessary.

*Id*. at 11628.

## IV. SUBSEQUENT EXEMPTIONS FROM PROCLAMATION 9705

39. In Proclamation 9740 of April 30, 2018 (Adjusting Imports of Steel into the United States), the President imposed quotas on articles of steel from South Korea and exempted articles of steel from South Korea from the 25% tariff. 83 Fed. Reg. 20,683 (May 7, 2018).

40. In Proclamation 9759 of May 31, 2018 (Adjusting Imports of Steel into the United States), the President imposed quotas on articles of steel from Argentina and Brazil and exempted articles of steel from Argentina and Brazil from the 25% tariff, and exempted articles of steel from Australia from the 25% tariff without imposing any quota on articles of steel from Australia. 83 Fed. Reg. 25,857 (June 5, 2018).

41. On May 17, 2019, in conjunction with negotiation of the United States-Mexico-Canada Agreement ("USMCA"), the United States announced that it had agreed to exempt articles of steel from Canada and Mexico from the 25% tariff.

42. The President did not impose any quotas on articles of aluminum or steel from Canada and Mexico. Joint Statement by the United States and Mexico on Section 232 Duties on Steel and Aluminum (attached Exhibit 5); Joint Statement by the United States and Canada on Section 232 Duties on Steel and Aluminum (attached as Exhibit 6).

43. As a result, articles of steel from Argentina, Australia, Brazil, Canada, Mexico and South Korea are currently exempt from the 25% tariff imposed by Proclamation 9705.

## V.    PROCLAMATIONS 9980

44.    On January 24, 2020, without any prior notice and nearly two years after issuing Proclamation 9705, the President issued Proclamation 9980, imposing, inter alia, a 25% tariff on U.S. imports of certain "derivative" products manufactured from steel, effective February 8, 2020. 85 Fed. Reg. 5281 (Jan 29, 2020).

45.    In support of his legal authority to issue Proclamation 9980, the President referred to the Steel Report, and to his instructions in Proclamation 9705 that the Secretary of Commerce inform the President of any need for further action under Section 232:

> 1. On January 11, 2018, the Secretary of Commerce (Secretary) transmitted to me a report on his investigation into the effect of imports of steel articles on the national security of the United States, and on January 19, 2018, the Secretary transmitted to me a report on his investigation into the effect of imports of aluminum articles on the national security of the United States. Both reports were issued pursuant to section 232 of the Trade Expansion Act of 1962, as amended (19 U.S.C. 1862).
> . . . .
>
> 4. In Proclamation 9704 and Proclamation 9705, I directed the Secretary to monitor imports of aluminum articles and steel articles, respectively, and inform me of any circumstances that in the Secretary's opinion might indicate the need for further action under section 232 of the trade Expansion Act of 1962, as amended.

85 Fed. Reg. 5281.

46.    Proclamation 9980 states that further action under Section 232 is warranted because the Secretary of Commerce has "informed" the President that "domestic steel producers' capacity utilization has not stabilized for an extended period of time at or above { } 80 percent." Id. at 5282.

47.    Proclamation 9980 also states that the Secretary of Commerce has "informed" the President that, "{a}lthough imports of aluminum articles and steel articles {included in

13

Proclamations 9704 and 9705} have declined since the imposition of the tariffs and quotas {pursuant to those Proclamations}, . . . imports of certain derivatives of aluminum articles and imports of certain derivatives of steel articles have significantly increased," and that the "net effect of the increase of imports of these derivatives has been to erode the customer base for U.S. producers of aluminum and steel." Id.

48.    Proclamation 9980 further states that "{i}t is the Secretary's assessment that foreign producers of these derivative articles have increased shipments of such articles to the United States to circumvent the duties on aluminum articles and steel articles imposed in Proclamation 9704 and Proclamation 9705, and that imports of these derivative articles threaten to undermine the actions taken to address the risk to the national security of the United States found in Proclamation 9704 and Proclamation 9705." Id.

49.    Proclamation 9980 imposed 25% tariffs on the following derivative articles of steel:

- nails, tacks (other than thumb tacks), drawing pins, corrugated nails, staples (other than those of heading 8305) and similar articles, of iron or steel, whether or not with heads of other material (excluding such articles with heads of copper), suitable for use in powder-actuated handtools, threaded (described in subheading 7317.00.30; and

- nails, tacks (other than thumb tacks), drawing pins, corrugated nails, staples (other than those of heading 8305) and similar articles, of iron or steel, whether or not with heads of other material (excluding such articles with heads of copper), of one piece construction, whether or not made of round wire; the foregoing described in statistical reporting numbers 7317.00.55.03, 7317.00.55.05, 7317.00.55.07, 7317.00.55.60, 7317.00.55.80 or 7317.00.65.60 only and not in other statistical reporting numbers of subheadings 7317.00.55 and 7317.00.55.65;

- bumper stampings of steel, the foregoing comprising parts and accessories of the motor vehicles of headings 8701 to 8705 (described in subheading 8708.10.30); and

- body stampings of steel, for tractors suitable for agricultural use (described in subheading 8708.29.21).

Id. at 5290-91.

50.     These tariffs do not apply to derivative articles of steel from countries previously exempted from the 25% tariff imposed by Proclamation 9705, *i.e.*, Argentina, Australia, Brazil, Canada, Mexico and South Korea.

51.     Proclamation 9980 states that these articles were selected if the following three criteria are all satisfied:

> (a)     the aluminum article or steel article represents, on average, two-thirds or more of the total cost of materials of the derivative article;"
>
> (b)     Import volumes of such derivative article increased year-to-year since June 1, 2018, following the imposition of the tariffs in Proclamation 9704 and Proclamation 9705 . . . in comparison to import volumes of such derivative article during the 2 preceding years; and
>
> (c)     Import volumes of such derivative article following the imposition of the tariffs exceeded the 4 percent average increase in the total volume of goods imported into the United States during the same period since June 1, 2018.

Id. at 5282.

## VI.     PROCLAMATIONS 9980 IS NOT AUTHORIZED UNDER SECTION 232

52.     To the extent the Secretary of Commerce provided information to the President supporting the action taken in Proclamation 9980, such information has not been made available to the public.

53.     The Secretary of Commerce has not conducted an investigation under Section 232, nor has he submitted to the President a report of an investigation under Section 232,

concerning the effect of imports of derivative articles of steel or aluminum on the national security of the United States.

54.    The April 19, 2017 investigation into the effects of imports of certain steel mill products on the national security of the United States and the resulting January 11, 2018 <u>Steel Report</u>, on which Proclamation 9980 purports to rely, did not involve any of the derivative articles of steel subject to Proclamation 9980, or derivative articles of steel in general.

55.    Pursuant to the express statutory limitations of Section 232, the Secretary of Commerce had to complete those investigations within 270 days, a period which expired in January 2018. The Secretary of Commerce is not authorized under Section 232 to make any additional findings or recommendations to the President regarding the April 2017 investigations after that date.

56.    The <u>Steel Report</u> were released in January 2018, over two years ago.

57.    Pursuant to Section 232, the President had to announce his determination regarding the <u>Steel Report</u> within 90 days, a period that expired in April 2018. The President is not authorized under Section 232 to make any additional determination, or take any additional action, with regard to the <u>Steel and Report</u> after that date.

58.    The President announced his determination based on the <u>Steel Report</u> in Proclamation 9705 in March 2018, nearly two years ago.

59.    Pursuant to Section 232, the President had to implement any action based on Proclamation 9705 within 15 days, a period that expired in March 2018. The President is not authorized under Section 232 take any steps to implement Proclamation 9705 after that date.

**VII.    THE TARIFFS IMPOSED ARE NOT RATIONALLY RELATED TO THE PURPORTED THREAT TO THE NATIONAL SECURITY OF THE UNITED STATES**

60.     Proclamation 9980 makes no assertion regarding the performance of any domestic industry producing one or more of the included derivative articles of steel, including whether any such domestic industry has experienced a decline.

61.     Proclamation 9980 makes no assertion regarding the effect on the national security of the United States of a decline in any domestic industry producing one or more of the included derivative articles of steel.

62.     The sole nexus provided in Proclamation 9980 between the derivative articles of steel included in Proclamation 9980 and the national security of the United States is that the importation of such derivative articles, in lieu of domestic manufacturing of such derivative articles, depresses the domestic demand for articles of steel that are used in the production of such derivative articles.

63.     However, the derivative articles of steel and aluminum subject to Proclamation 9980 represent a negligible portion of overall U.S. imports of derivative articles of steel and a negligible portion of the overall U.S. market for derivative articles of steel.

64.     For example, as reflected in Exhibit 7 steel horseshoe nails included in Proclamation 9980 are not produced in the United Stated at all, and have not been for years.

65.     Conversely, Proclamation 9980 omits numerous derivative articles of steel that represents a far larger portion of overall U.S. imports of derivative articles of steel and a far larger portion of the overall U.S. market for derivative articles of steel.

66.     For example, imports of stranded steel wire and other articles of Harmonized Tariff Schedule heading 7312—derivative articles of steel not included in the Proclamation 9980—from countries other than Argentina, Australia, Brazil, Canada, Mexico and South Korea

account for approximately 3 percent (calculated by value) of imports of all derivative articles of steel from countries other than Argentina, Australia, Brazil, Canada, Mexico and South Korea.

67.     Moreover, in selecting the derivative articles of steel to include to Proclamation 9980, the President did not apply the criteria set forth in Proclamation 9980, which purported to include any derivative articles of steel where (a) steel represents, on average, two-thirds or more of the total cost of materials of the derivative article; (b) import volumes of such derivative article increased year-to-year since June 1, 2018, following the imposition of the tariffs in Proclamation 9705, in comparison to import volumes of such derivative article during the 2 preceding years; and (c) import volumes of such derivative article following the imposition of the tariffs exceeded the 4 percent average increase in the total volume of goods imported into the United States during the same period since June 1, 2018.

68.     For example, stranded steel wire and other articles of Harmonized Tariff Schedule heading 7312 are articles for which the steel content represents, on average, more than two-thirds of the total cost of materials and for which import value increased by 41 percent over the twenty-four-month period, and 28 percent over the twelve month period, ending on June 1, 2019. Such derivative articles were not included in the scope of the derivative articles subject to additional 25% tariffs under Proclamation 9980.

69.     Finally, Proclamation 9980 provides no rationale for exempting derivative articles of steel from Argentina, Australia, Brazil, Canada, Mexico and South Korea.

70.     Articles of steel from these countries were exempted from the tariffs imposed by Proclamation 9705 based on quotas imposed on such articles or on other agreements between the United States and each exempted country as to trade in such articles.

71.     Proclamation 9980 does not impose quotas on derivative articles of steel from Argentina, Australia, Brazil, Canada, Mexico or South Korea, nor does Proclamation 9980 indicate any ongoing negotiations with Argentina, Australia, Brazil, Canada, Mexico or South Korea that could otherwise mitigate any effect that importation of derivative articles from these countries might otherwise have.

72.     The exemptions applicable to derivative articles from Argentina, Australia, Brazil, Canada, Mexico or South Korea account for approximately 40 percent of imports of those derivative articles into the United States. See Chad P. Bown, Trump's steel and aluminum tariffs are cascading out of control (attached as Exhibit 8).

## COUNT I – ULTRA VIRES ACTS BY THE PRESIDENT
## AND SECRETARY OF COMERCE

73.     FPD incorporates by reference paragraphs 1 through 72 of this Complaint.

74.     Congress has the exclusive "power to lay and collect taxes, duties, imports and excises" and "to regulate Commerce with foreign nations." U.S. CONST. art. 1, §8.

75.     Through Section 232, Congress has vested the President with certain authority to regulate commerce with foreign nations in response to imports into the United States in such quantities or under such circumstances as to threaten to impair the national security of the United States.

76.     The President has no statutory authority to regulate commerce with foreign nations in response to imports into the United States in such quantities or under such circumstances as to threaten to impair the national security of the United States other than under the statutory provisions of Section 232.

77.     The President has no independent constitutional authority to regulate commerce with foreign nations in response to imports into the United States in such quantities or under such circumstances as to threaten to impair the national security of the United States.

78.     Section 232 delineates the procedure that the Secretary of Commerce and President must follow before the President may take any action with respect to imports into the United States in such quantities or under such circumstances as to threaten to impair the national security of the United States.

79.     Section 232 also specifies the determinations that the Secretary of Commerce and President must make before the President may take any action with respect to imports into the United States in such quantities or under such circumstances as to threaten to impair the national security of the United States.

80.     With respect to the Secretary of Commerce, Section 232 requires that he "immediately initiate and appropriate investigation," and "immediately provide notice to the Secretary of Defense"; that "in the course of {the} investigation" he shall "consult with the Secretary of Defense" and "appropriate officers of the United States", if "appropriate and after reasonable notice, hold public hearings or otherwise afford interested parties an opportunity to present information and advice"; and, "no later than . . . 270 days after the date on which {the} investigation is initiated . . . ., submit to the President a report on the findings of such investigation," which "shall be published in the Federal Register" except for any portion that contains classified or proprietary information. 19 U.S.C. §1682(b)(2)-(3).

81.     With respect to the President, Section 232 requires that "within 90 days after receiving a report" issued under Section 232 by the Secretary of Commerce, in which the Secretary of Commerce "finds that an article is being imported into the United States in such

quantities or under such circumstances as to threaten to impair the national security, "the President shall "determine whether {he} concurs" and, if so, "determine the nature and duration of the action that . . . must be taken to adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security." 19 U.S.C. §1682(c)(1)(A). The President must then implement any such action "no later than the date that is 15 days after the day on which the President determines to take action." Id. at §1682(c)(1)(B).

82. In stark contrast to this proscribed process, Proclamation 9980 states that the Secretary of Commerce "*informed*" the President that domestic steel and aluminum capacity utilization had not stabilized at or above the 80 percent level, "*informed*" the President that imports of certain derivative articles of steel and aluminum had increased, made an "*assessment*" that such imports of these derivative articles "threaten to undermine the actions taken" by the President in Proclamations 9704 and 9705 "to address the risk to the national security of the United States found in the Proclamation 9704 and 9705," and "*assessed*" that reducing imports of certain derivative articles would "address the threatened impairment of the national security of the United States." 85 Fed. Reg. 5281-82.

83. The Secretary of Commerce did not provide such "information" or make such "assessments" pursuant to an investigation under Section 232, nor did he do so in a report submitted within 270 days of the initiation of an investigation under Section 232.

84. There is no record evidence that the Secretary of Commerce notified or consulted with the Secretary of Defense or any other officer of the United States, as required under Section 232.

85. The Secretary of Commerce did not notify the public or provide an opportunity for public comment.

86.     No portion of the Secretary of Commerce's "information" or "assessments" was published in the Federal Register or any other place.

87.     In short, the Secretary of Commerce complied with none of the requirements of Section 232.

88.     Accordingly, the "information" provided, and "assessment" made, by the Secretary of Commerce were acts outside the legal authority of the Secretary of Commerce and cannot form the basis of an action taken by the President under Section 232 to adjust the imports of an article and its derivatives so that such imports will not threaten to impair the national security.

89.     The Secretary of Commerce submitted the Steel Report to the President in January 2018, more than two years before the President issued Proclamation 9980.

90.     Because the elapsed time far exceeds the 90 days permitted under Section 232 for a determination by the President, the Steel Report cannot form the basis of an action taken by the President under Section 232 to adjust the import of an article and its derivatives so that such imports will not threaten to impair the national security.

91.     The President issued Proclamation 9705 on March 8, 2018, nearly two years before the President issued Proclamation 9980.

92.     Because the elapsed time far exceeds the 15 days permitted under Section 232 for implementation of a determination by the President, Proclamation 9705 cannot form the basis of an action taken by the President under Section 232 to adjust the imports of an article and its derivatives so that such imports will not threaten to impair the national security.

93.     Accordingly, Proclamation 9980 is contrary to Section 232 and is therefore void.

## COUNT II – UNCONSTITUTIONAL DELAGATION

94.     FPD incorporates by reference paragraphs 1 through 72 of this Complaint.

95.     Congress has the exclusive "power to lay and collect taxes, duties, imports and excises" and "to regulate Commerce with foreign nations." U.S. CONST. art. 1, §8.

96.     Through Section 232, Congress has vested the President with certain authority to regulate commerce with foreign nations in response to imports into the United States in such quantities or under such circumstances as to threaten to impair the national security of the United States.

97.     The President has no statutory authority to regulate commerce with foreign nations in response to imports into the United States in such quantities or under such circumstances as to threaten to impair the national security of the United States other than the specific statutory provisions of Section 232.

98.     The President has no independent constitutional authority to regulate commerce with foreign nations in response to imports into the United States in such quantities or under such circumstances as to threaten to impair the national security of the United States.

99.     Section 232 delineates the procedure that the Secretary of Commerce and President must follow before the President may take any action with respect to imports into the United States in such quantities or under such circumstances as to threaten to impair the national security of the United States.

100.    Section 232 also specifies the determinations that the Secretary of Commerce and President must make before the President may take any action with respect to imports into the United States in such quantities or under such circumstances as to threaten to impair the national security of the United States.

101.    With respect to the Secretary of Commerce, Section 232 requires that he "immediately initiate and appropriate investigation," and "immediately provide notice to the Secretary of Defense", that "in the course of {the} investigation" he shall "consult with the Secretary of Defense" and "appropriate officers of the United States"; if "appropriate and after reasonable notice, hold public hearings or otherwise afford interested parties an opportunity to present information and advice"; and, "no later than . . . 270 days after the date on which {the} investigation is initiated . . ., submit to the President a report on the findings of such investigation," which "shall be published in the Federal Register" except for any portion that contains classified or proprietary information 19 U.S.C. §1682(b)(2)-(3).

102.    The Secretary of Commerce did not comply with any of these requirements with regard to the "information" and "assessments" he provided to the President in connection with Proclamation 9980.

103.    With respect to the President, Section 232 requires that "within 90 days after receiving a report" issued under Section 232 by the Secretary of Commerce, in which the Secretary of Commerce "finds that an article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security," the President shall "determine whether {he} concurs" and, if so, "determine the nature and duration of the action that . . . must be taken to adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security." 19 U.S.C. §1682(c)(1)(A). The President must then implement any such action "no later than the date that is 15 days after the day on which the President determines to take action." Id. at §1682(c)(1)(B).

104.    The President did not comply with any of these requirements when he issued Proclamation 9980.

105.     In addition, the "information" and "assessments" the President received from the Secretary of Commerce in connection with Proclamation 9980 were not the report and findings required before the President can take any action under Section 232 to adjust the imports of an article and its derivatives so that such imports will not threaten to impair the national security.

106.     Nevertheless, Proclamation 9980 purports to be an exercise of the President's authority under Section 232.

107.     As applied by the President and Secretary of Commerce with respect to Proclamation 9980, Section 232 is an unconstitutional delegation of Commerce's exclusive power to "lay and collect . . . duties" and "to regulate Commerce with foreign nations," U.S. CONS. art. 1, §8, devoid of an intelligible principle.

108.     Accordingly, Proclamation 9980 is not a constitutional exercise of the President's authority under Section 232 and is therefore void.

## COUNT III – EQUAL PROTECTION

109.     FPD incorporates by reference paragraphs 1 through 72 of the Compliant.

110.     The equal protection of the laws of the United States is guaranteed by the Fifth Amendment's Due Process requirement, which prohibits the government from unjustifiably treating similarly situated persons differently. Bolling v. Sharpe, 347 U.S. 497, 499 (1954). A classification that "neither burdens a fundamental right nor targets a suspect class" will be upheld "so long as it bears a rational relation to some legitimate end." Romer v. Evans, 517 U.S. 620, 631 (1996); Armour v. City of Indianapolis, 566 U.S. 673, 680 (2012).

111.     FPD is in all relevant respects similarly situated to importers into the United States of derivative products of steel that are not listed in Proclamation 9980, despite such

derivative articles meeting the three criteria set forth by the President for inclusion in Proclamation 9980.

112.    FPD is in all relevant respects similarly situated to importers into the United States of derivative products of steel that are listed in Proclamation 9980, but which are exempt from the 25% tariff on derivative steel products because such importers source their product in Argentina, Australia, Brazil, Canada, Mexico or South Korea.

113.    Proclamation 9980 purports to remove the threatened impairment of the national security of the United States by adjusting importation of derivative articles of steel that could displace demand for domestic articles of steel used to manufacture such derivative articles.

114.    The inclusion of steel horseshoe nails as derivative articles subject to Proclamation 9980, and exclusion of other derivative articles from Proclamation 9980, despite such other derivative articles meeting the three criteria for inclusion set forth in Proclamation 9980, and despite the importation of such other derivative articles into the United States displacing a greater portion of domestic demand for articles of steel, is not rationally related to the stated purpose of Proclamation 9980.

115.    The inclusion of certain derivative articles of steel manufactured in certain countries in Proclamation 9980, and exclusion of identical derivative articles of steel manufactured in Argentina, Australia, Brazil, Canada, Mexico or South Korea, despite derivative articles manufactured in some of the excluded countries displacing a greater portion of domestic demand for articles of steel and aluminum, is not rationally related to the stated purpose of Proclamation 9980.

116.    Accordingly, because there is no legitimate governmental purpose for the disparate treatment of FPD, Proclamation 9980 violates equal protection and is unconstitutional.

## DEMAND FOR JUDGMENT AND RELIEF

WHEREFORE, Plaintiff respectfully requests this Court to hold that this Court:

a.  Enter judgment in favor of FPD and declare Proclamation 9980 void;

b.  Permanently enjoin Defendants from enforcing Proclamation 9980 against FPD's entries;

c.  Order CBP to refund FPD any duties collected pursuant to Proclamation 9980;

d.  Grant such additional relief as the Court may deem just and proper.

Respectfully submitted,

**BARNES, RICHARDSON & COLBURN, LLP**
Counsel for Plaintiff

By:      s/ David G. Forgue
       David G. Forgue
       303 East Wacker Drive
       Suite 305
       Chicago, Illinois 60601
       (312) 297-9555
       dforgue@barnesrichardson.com

Dated:  May 1, 2020